Cite as 2022 Ark. App. 187

# ARKANSAS COURT OF APPEALS
DIVISION III
No. CV-21-481

| | |
|---|---|
| JEFFREY JOHNSON | Opinion Delivered April 27, 2022 |
| APPELLANT | |
| | APPEAL FROM THE ARKANSAS |
| V. | WORKERS' COMPENSATION |
| | COMMISSION |
| PECO FOODS, INC.; OCCUSURE | [NO. G805984] |
| CLAIMS SERVICES, LLC; AND DEATH | |
| & PERMANENT TOTAL DISABILITY | |
| TRUST FUND | |
| APPELLEES | REVERSED AND REMANDED |

**PHILLIP T. WHITEAKER, Judge**

Appellant Jeffrey Johnson suffered a cardiac injury when he was twenty-nine years old. He pursued workers'-compensation benefits, contending that he sustained a compensable injury in the course and scope of his employment with appellee Peco Foods, Inc. ("Peco"). An administrative law judge (ALJ) determined that his injury was compensable and awarded benefits.[1] The full Arkansas Workers' Compensation Commission, however, reversed the order of the ALJ. Johnson timely appealed to this court, where he contends that

---

[1]The ALJ also determined that the medical treatment Johnson received was reasonable, necessary, and related to his compensable injury and that he was entitled to temporary total-disability benefits. Because the Commission reversed the ALJ's initial finding that Johnson's injury was compensable, these issues are not before us in this appeal.

the Commission erred in determining that his injury was not compensable. We reverse and remand.

## I.  *Background*

In May 2018, Johnson began working for Peco, a poultry producer. During his new-employee orientation, a company representative advised him that most employees "would come down with a virus" due to working in a poultry-processing environment but that the virus "would pass in a week."

Johnson was placed in the "Live Hang" department at Peco, where his job duties were to grab live chickens by their feet and hang them upside down. He described the working conditions in the poultry plant as "horrible."  He explained that there were chicken feces all over the floor and all over the workers on the line. Johnson would frequently be "flogged" by the chickens with their wings, pecked with their beaks, and scratched with their spurs. His only safety equipment consisted of a beard net, a set of gloves, and safety glasses. Johnson was repeatedly scratched on his arms, and according to Johnson, "the pee, the poop . . . just . . . soaked in through the sores" and cuts and scratches on his arms.

Soon after starting working at Peco, Johnson began experiencing health complications. He developed rashes on his arms, chest, and stomach, which he repeatedly reported to the company nurse. She gave him Desitin, a diaper-rash cream, to apply to his rash, but the rash did not resolve. Instead, he developed other symptoms, including nausea, vomiting, diarrhea, and hot-and-cold temperature swings. He reported these new symptoms

to the nurse as well but was offered no medical treatment other than the diaper-rash cream. Johnson's symptoms did not abate but "just kept getting worse and worse and worse."

When his symptoms did not improve, Johnson was allowed to move to a different department called "Evest." In this department, the chickens were defeathered and decapitated, and Johnson's duties included pulling the heads off of birds that had not been properly decapitated. Once again, the only safety equipment he was given consisted of a beard net, safety glasses, and gloves.

Johnson worked both the Live Hang and Evest departments for several weeks, but his symptoms stayed the same.[2] He continued to report his medical problems to the nurse, and she continued to offer diaper-rash cream as the only treatment. While other workers also experienced similar symptoms (rashes, nausea, vomiting, and diarrhea), they got better; Johnson did not. Despite the severity of his symptoms, he never went to the emergency room or other doctor because his supervisor told him that he would be fired on the spot if he did.

On July 8, 2018, two months after he started working at Peco, Johnson was found unresponsive and cyanotic. He was rushed to the hospital, admitted to intensive care, and treated for cardiopulmonary arrest and acute hypoxemic respiratory failure.

II. *Medical Evidence*

---

[2]Johnson was eventually allowed to move to the "Breading Department," where he separated chicken parts and put the breading mixture into the machine. His symptoms, however, still did not improve.

3

During his hospitalization, Johnson received treatment from Dr. Wilber. Dr. Wilber noted that the cause of Johnson's cardiomyopathy was "unclear at this point." Dr. Wilber did, however, enter progress notes reflecting that Johnson worked at a chicken plant, positing, "Acute viral myocarditis? Sounds like he may have a recent viral illness" and "possible viral syndrome causing a viral cardiomyopathy." In a July 14 progress note regarding Johnson's cardiomyopathy, Dr. Wilber stated: "Possibly viral induced. He had a viral syndrome prior to coming to the hospital. He may have had an arrhythmia from a viral cardiomyopathy." In addition to Dr. Wilber, Johnson was treated by Dr. Godfrey during his hospitalization. Dr. Godfrey discussed with Johnson and his family "the possibility of a viral etiology with cardiomyopathy and subsequent cardiopulmonary arrest."

After his hospitalization, Johnson was treated by other physicians. Dr. Tedder, a cardiologist, noted that while Johnson had a family history of heart disease, Johnson himself did not have any prior cardiac history. In the "history of present illness," Dr. Tedder further noted that Johnson "had some type of virus 2 weeks prior to this event, that he contracted while at work on a chicken farm" and that "he had a viral type illness with a rash on his arms about 2 to 3 weeks prior to the event and could have developed a viral cardiomyopathy."

Johnson also began seeing Dr. Osborne as his primary-care physician after he was released from the hospital. In her assessment following his first visit, Dr. Osborne noted that Johnson "had been working in a chicken house and it was believed that he had suffered a viral cardiomyopathy." In both the "Active Problems" and "Past Medical History" portions of her office note, Dr. Osborne listed "systemic viral illness." Although she noted a family

4

history of congestive heart failure, coronary artery disease, and myocardial infarction, she also wrote that Johnson was "thought to have suffered from viral cardiomyopathy from working in chicken plant." In fact, on November 5, 2019, Dr. Osborne wrote a letter in which she stated that she treated Johnson after his July 8, 2018 on-the-job injury for "viral cardiomyopathy resulting in cardiopulmonary arrest twice." She further stated, within a reasonable degree of medical certainty, that "the viral illness [Johnson] contracted at work caused the cascade of medical problems afterwards."

In response to Dr. Osborne's opinion, Peco submitted a letter from Dr. Michael Gelfand, an infectious-disease and internal-medicine specialist from Memphis. Dr. Gelfand stated that he never examined Johnson but had reviewed Johnson's medical records and his deposition. Dr. Gelfand concluded and opined that, among other things, he was unaware of any infection likely to be acquired from exposure to chickens that was expected to cause cardiomyopathy; in addition, Dr. Gelfand noted that there was no medical evidence of an infectious etiology to Johnson's illness and that no viral studies had been done.

### III. *Proceedings Before the Commission*

Johnson filed a claim for workers'-compensation benefits. Peco contested his claim, and the matter proceeded to a hearing before an ALJ. At the hearing, Johnson was the only witness to testify regarding the working conditions, his exposure to live chickens, and his symptoms resulting from his exposure to live chickens. The ALJ, observing that Peco did not call any witnesses to refute Johnson's testimony, permitted a negative inference to be drawn from the absence of such testimony. Thus, the ALJ found Johnson's testimony to be credible

5

and undisputed and rejected Peco's argument that Johnson failed to prove he was infected with a virus, citing the medical histories that were replete with references to Johnson's "symptoms of the virus [he] suffered . . . while employed by Peco Foods."

Concerning the medical evidence, the ALJ rejected the opinion of Dr. Gelfand. In so doing, the ALJ noted that Dr. Gelfand had neither met nor treated Johnson. In addition, the ALJ commented that although Dr. Gelfand mentioned that his practice is in infectious diseases, a review of the articles and presentations in his CV did not "reveal any specific work with patients with exposure to chickens nor does he point to any such experience or to any specific medical records to support his conclusions."

On the other hand, the ALJ deemed Dr. Osborne's opinion to be reliable, noting that Dr. Osborne had been treating Johnson and coordinating his medical care from July 2018 to the time of the hearing. Because Johnson showed no signs of cardiac illness prior to his employment at Peco and his exposure to live chickens, and given Dr. Osborne's opinion that Johnson suffered a viral illness at work that caused his "cascade of medical problems," the ALJ concluded that the preponderance of the evidence demonstrated a causal connection between the work incident and the disabling injury and determined that Johnson had proved that he suffered a compensable injury.

Peco appealed to the full Commission, which reversed the opinion of the ALJ. First, the Commission found that Johnson had failed to prove that he sustained an injury caused by a specific incident, identifiable by time and place of occurrence, during the course of his employment as required by Arkansas Code Annotated section 11-9-102(4)(A)(i) (Repl. 2012).

6

Second, the Commission determined that Johnson had failed to prove that his heart injury was caused by "some unusual and unpredicted incident" that was the major cause of the physical harm. *See* Ark. Code Ann. § 11-9-114(b) (Repl. 2012).

Next, the Commission found that Johnson had failed to prove causation. Although the Commission acknowledged Dr. Osborne's opinion that Johnson's cardiac illness was caused by a viral infection linked to his exposure to chickens, it rejected her opinion in favor of Dr. Gelfand's conclusion that he was unaware of any viral infection that was likely to be acquired from such exposure. The Commission credited Dr. Gelfand's opinion that Johnson's cardiomyopathy "could not have been caused" by a chicken-related viral infection. As such, the Commission concluded that Johnson had failed to prove by a preponderance of the evidence that he sustained a compensable heart injury.[3] Johnson timely appealed the Commission's decision.

IV.  *Standard of Review*

Our standard of review in workers'-compensation cases is well settled. On appeal, this court views the evidence in the light most favorable to the Commission's decision and affirms the decision if it is supported by substantial evidence. *Univ. of Ark. at Pine Bluff v. Hopkins*, 2018 Ark. App. 578, 561 S.W.3d 781. Substantial evidence exists if reasonable minds could reach the Commission's conclusion. *Id.* If reasonable minds could reach the

---

[3]The Commission also found that, to the extent Johnson alleged he suffered from an occupational disease, he failed to prove by a preponderance of the evidence that his employment caused his heart injury as is required under Arkansas Code Annotated section 11-9-601(E)(1)(B) (Supp. 2021). This finding, however, is not at issue in this appeal.

7

result found by the Commission, then the appellate court must affirm, even when it might have reached a different result from the Commission. *Id.*

On appeal, we recognize the exclusive province of the Commission regarding the credibility of witnesses and the weight to be given to their testimony. *Evans v. Bemis Co., Inc.*, 2010 Ark. App. 65, 374 S.W.3d 51. Thus, we are foreclosed from determining the credibility and weight to be accorded to each witness's testimony, and we defer to the Commission's authority to disregard the testimony of any witness, even a claimant, as not credible. *Wilson v. Smurfit Stone Container*, 2009 Ark. App. 800, 373 S.W.3d 347. Likewise, we recognize the Commission's province to reconcile conflicting evidence and determine the facts. *Eldridge v. Pace Indus., LLC*, 2021 Ark. App. 245, 625 S.W.3d 734. Thus, this court will reverse the Commission's decision only if it is convinced that fair-minded persons with the same facts before them could not have reached the conclusions arrived at by the Commission. *Prock v. Bull Shoals Boat Landing*, 2014 Ark. 93, 431 S.W.3d 858.

## V. *Discussion*

As the claimant, Johnson bears the burden of proving a compensable injury. *Sheridan Sch. Dist. v. Wise*, 2021 Ark. App. 459, 637 S.W.3d 280. Under Arkansas law, a "compensable injury" is defined as "[a]n accidental injury causing internal or external physical harm to the body . . . arising out of and in the course of employment and which requires medical services or results in disability or death. An injury is 'accidental' only if it is caused by a specific incident and is identifiable by time and place of occurrence[.]" Ark. Code Ann. § 11-9-102(4)(A)(i). A compensable injury must be established by medical evidence supported by

objective findings. Ark. Code Ann. § 11-9-102(4)(D). Johnson must meet his burden of proof by a preponderance of the evidence. Ark. Code Ann. § 11-9-102(4)(E)(i).

Johnson argues that the Commission erred in finding that he failed to prove that he sustained a compensable injury for four reasons: (1) the Commission erred in concluding that he did not prove that he sustained an injury caused by a specific incident, identifiable by time and place of occurrence, during the course of his employment; (2) the Commission incorrectly concluded that he did not prove that some unusual and unpredicted incident occurred; (3) the Commission "misrepresented" Dr. Gelfand's opinion and what is needed to prove causation in order to find that Johnson did not prove causation; and (4) he sustained a compensable injury. We agree with Johnson's third argument that the Commission misrepresented or misinterpreted Dr. Gelfand's medical opinion.

Here, Johnson claimed that he sustained a compensable injury by contracting a viral infection at work that led to his cardiac injuries. Without question, Johnson experienced cardiac problems. Before the Commission, the fundamental questions were whether Johnson was infected with a virus and whether the virus led to his cardiac injuries. On these questions, Johnson presented medical evidence from all of his treating physicians indicating that they believed there was a viral infection that caused his cardiomyopathy and other heart conditions. Dr. Osborne specifically concluded that within a reasonable degree of medical certainty, "the viral illness [Johnson] contracted at work caused the cascade of medical problems afterwards."

Conversely, Peco presented the opinion of Dr. Gelfand, who specifically stated as follows:

> My opinions are expressed within a reasonable medical certainty (more likely than not).
>
> There is no medical evidence of an infectious etiology of the cardiac illness suffered by Mr. Johnson. No viral studies or myocardial biopsy was done by his physicians.
>
> I am not aware of any infection likely to be acquired from a contact with/exposure to chickens that is expected to cause a cardiomyopathy.
>
> The clinical course of a prolonged illness with nausea, vomiting, diarrhea and fever over the period of June 2018 (as described by Mr. Johnson in his deposition), is inconsistent with a viral illness.
>
> In summary, I find no evidence that Mr. Johnson's cardiac illness is related to an occupational exposure at Peco Foods.
>
> I base my opinion on my clinical experience and general knowledge and the pathophysiology and natural history of infectious diseases, including viral myocarditis and infections related to exposure to birds, including chickens.

The Commission chose to accept Dr. Gelfand's opinion over Dr. Osborne's opinion, a matter that is within its province to resolve. *See, e.g.*, *Griffith v. Medcath, Inc.*, 2009 Ark. App. 777, at 4 ("The Commission has the duty to weigh . . . competing opinions and translate the medical evidence into findings of fact."). We acknowledge the general rule that the Commission is not required to believe the testimony of any witness and may accept and translate into findings of fact only those portions of testimony it deems worthy of belief. *Holloway v. Ray White Lumber Co.*, 337 Ark. 524, 990 S.W.2d 526 (1999). The Commission, however, has a duty to make a proper de novo review of the record. *Id.* at 529, 990 S.W.2d

at 529. In its de novo review, if the Commission errs when it translates the evidence, and that error is expressly relied upon in reaching its decision, the reviewing court "is left to speculate concerning what evidence the Commission intended to rely on when making its decision." *Id.* at 529, 990 S.W.2d at 529; *see also Tucker v. Roberts-McNutt, Inc.*, 342 Ark. 511, 29 S.W.3d 706 (2000); *Meister v. Safety Kleen*, 339 Ark. 91, 3 S.W.3d 320 (1999). In such circumstances, the Commission's erroneous factual findings require reversal. *See Tucker*, *supra*.

We conclude that the Commission erred in its translation of Dr. Gelfand's opinion. In finding that Johnson failed to prove he sustained a compensable injury, the Commission wrote as follows:

> [Dr. Osborne's opinion is] not conclusive because as Dr. Gelfand--an expert on this topic--pointed out, neither Dr. Osborne nor any other of [Johnson's] treating physicians performed any viral studies or myocardial biopsies necessary to reach such a conclusion. In fact, according to Dr. Gelfand, he is not aware of any viral infection that is likely to be acquired from exposure to chickens that would cause [Johnson's] cardiomyopathy. In other words, not only did [Johnson] fail to prove causation, but according to Dr. [Gelfand] *it is not even possible*. The Full Commission credits the expert of Dr. Gelfand that [Johnson's] cardiomyopathy could not have been caused by a viral infection likely to be acquired from exposure to chickens.

(Emphasis added.)

Here, the Commission made a factual finding that it was *impossible* for Johnson's cardiac illness to have been caused by a poultry-related virus based on the opinion of Dr. Gelfand. Dr. Gelfand did not, however, offer such opinion. Instead, he said he was unaware of such a virus and that Johnson's long-duration symptoms were not consistent with a virus. Thus, the Commission misconstrued what he actually said, and its conclusion is based on a

11

misstatement. Because the Commission erroneously translated the medical evidence concerning the cause of Johnson's illness, we must reverse and remand for the Commission to reexamine the evidence.

Reversed and remanded.

VIRDEN and MURPHY, JJ., agree.

*Laura Beth York*, for appellant.

*Gill Ragon Owen, P.A.*, by: *Jason A. Lee*, for separate appellee Peco Foods, Inc.